"I give my daughter Susan Jiggits the twelve negroes, and stock of horses and cattle, household goods, etc., put in her possession on her marriage with Dr. William Davis; also $1,000, which was appropriated to the payment of Dr. Davis's debts as executor to his estate after his death, which money was credited said estate in settlement of account.
"I give unto my grandson, William B. Inge, the fourteen negroes lent to his mother, Elizabeth Inge, with all the stock and household furniture put in her possession at her marriage with Dr. R. Inge; the negro property I have heretofore made my grandson W. B. a deed of gift for, which is in full of the legacy to my said departed daughter Elizabeth.
"I give unto my son John Bullock the $8,000 furnished in establishing him with a store in Clarksville in 1818, which has been paid over to him; also, Squire and Charles, being a part thereof; also a house, lot, furniture, etc., furnished, all of which I hereby give him and his heirs forever in like manner. I now give him $4,000, to be made out of the first money that is made after paying all the debts that may be owing by the concern of Bullock Norwood in Warren, North Carolina.
"I give unto my son Richard $8,000 and profits proceeding therefrom, as settled by us at the dissolution of our business in 1825, which may be seen in Wm. R. Bullock's Ledger C; also, etc., to him and his heirs forever. *Page 249 
"I give unto my daughter Lucy Lewis the fifteen negroes I placed in her possession at her marriage with Mr. N.M. Lewis, with, etc., to her and her heirs forever.
"I give unto my son James M. Bullock my two blacksmiths, (308) Peter and Tom, with the blacksmith's tools, and $7,000 to be made out of my estate, to be paid to him by my executor whenever my son James marries or arrives at the age of 20 years (to have interest from the time of my decease) or at a sooner period, should my executor think it would be to James' interest to have it; I also give him, etc.
"I also give unto my wife, Lucy, and son James the part of the tract of land I now live on, lying on the south side of the road leading from Captain W. Norwoods mill to Shilo meeting-house, being part of, etc., with all the negroes thereon, except those heretofore given, etc., Gabriel, Joe, Silvey, Creatia, and boy child Mick, Bob, Jenny and son, Deler (Culbreath), the balance of negroes on said plantation, about fifty-one or two in number, with all the stock thereon not heretofore given, household and kitchen, etc., all of which is given during the natural life of my wife, Lucy, and at her death I give the land to my son James, his heirs and assigns forever. Should my son James marry, or should there become any discontent between my wife and son James, I would recommend to my executor to have a comfortable house built, but not very costly, on some part of the land for either party, as will be most advisable; and let there be a division of these fifty-two or three negroes, James to have one-third of them, my wife two-thirds.
"I give unto my sons John, Richard, and the heirs proceeding from the body of William H. Bullock, the tract of land lying on the north side of the main road leading from, etc., to them and their heirs forever.
"I give unto my son John Bullock, in trust for the benefit of the heirs of my daughter Fanny Ann Hunt, the fifteen negroes I put in her possession at her marriage with Captain J. Hunt; also, the tract of land whereon Captain Hunt now lives, containing 585 acres. I give the stock of horses, cattle, and household furniture loaned John and Frances, in the same manner to them and their heirs forever, to the heirs proceeding from the body of my daughter Fanny Ann; but be it understood, as I have advanced money and paid for this land given the heirs (309) of Fanny Hunt, there will be a drawback on those legacies which I may give to the said Fanny Ann, and it will be understood that each legatee must make up these debts and have so much discounted in their ratio at the division of my estate that each legatee may share and share alike.
"I give unto my son John Bullock, in trust, nevertheless, for the heirs of W. H. Bullock, the interest I purchased of Colonel John Baptist in Clarksville of stock in trade with said son John of about $5,400, to still *Page 250 
continue to manage it to the best advantage as he has done for several years past, with all purchases that he has made of said stock for the benefit of John and W. Bullock, I do hereby leave for the benefit of the heirs of W. Bullock; it is well known that the first moiety given my son William there is none remaining.
"Having about eighteen negroes at the mill plantation, in addition to them will be added Gabriel, etc., making, if no mistake in count, twenty-seven there, with all the stock of every description in said plantation except property as my son W. H. has in loan and brought with him, with all thereto pertaining, with the balance of the concern in Warren, with all the debts due me after discharging my own debts, with every other species of property I possess that does not belong to the tract of land whereon I now live, after paying James his legacy, be equally divided between my sons John, Richard, and the heirs of W. H. Bullock as one distributee, my daughter Susan Jiggits, Lucy Lewis, the heirs of Fanny Hunt as one distributee, and my son James M. Bullock, all the foregoing property, to be equally divided, share and share alike; but it will be understood that my son John Bullock and the heirs of Fanny Hunt will have a considerable drawback, as they are considerably beforehand in receiving of my estate; therefore, what (310) they have and will receive will be accounted as part of their legacy and the quota made up to them, so as all will share and share alike at the first division.
"After the death of my wife, I wish an equal division of my estate that may have been loaned to her or my son James, with every species of property not heretofore given, to be equally divided between my sons John, Richard, and the heirs of W. Bullock as one distributee, my daughter Susannah Lucy, the heirs of Fanny Hunt as one distributee, and my son J. M. Bullock, share and share alike, all the property that will be received by virtue of this my last will and testament (not adverting to that that has been heretofore given). I give it on the following conditions: if those to whom it is given die without a lawful heir, then in that case for their property to return to the surviving brothers and sisters, or to their heirs in case they should die first and leave heirs."
"A CODICIL TO THE FOREGOING WILL.
"I give unto my son Richard Bullock negro boys Anthony and Sam, now in his possession. I give unto my son John Bullock, for the benefit of the heirs of W. Bullock which may proceed from his body, Jonas, etc., with their future increase. The negroes named in the foregoing will given my son John for the benefit of the heirs of W. Bullock and *Page 251 
Fanny Hunt, which was named without the increase, but be it understood that I intended to convey them and their increase, and do hereby convey them and their increase."
Of this will the testator appointed his son, the plaintiff, sole executor. The bill charged that in many respects it was difficult to put a construction on the will which was satisfactory to the plaintiff or which he could safely adopt, especially as some of the legatees and devisees (those supposed to be intended by the description of the heirs of William H. Bullock and Fanny Ann Hunt, for whom the plaintiff was constituted testator, were infants of tender years. The bill then set forth the difficulties which the plaintiff experienced, in the following order: That it was uncertain whether the issue of the slaves mentioned in the first, second, and fifth clauses of the will passed to the legatees respectively named therein, or was a part of (311) the residue and subject to division as provided by the residuary clause.
That as to the bequest of the plaintiff of the testator's interest in the Clarksville store, "in trust for the heirs of William H. Bullock," the plaintiff alleged that he was in that store a partner with his testator; that the testator's interest therein had been apropriated [appropriated] by him for many years to the maintenance and support of the family of his son William H. Bullock, who had become insolvent; that by these advances the property had been nearly exhausted; that it was the testator's habit to charge his children with all the property which he conveyed to them and credit them with that which they returned to him; at a short period before the death of the testator the plaintiff had by his directions assigned all the effects of that partnership to the heirs of William and Richard Bullock, another company in which the testator was interested; that one-half of the sum paid by the latter copartnership for this assignment was placed on the books of the testator to the credit of William H. Bullock, so that in appearance this was a debt due him, when in fact it was a legacy. The plaintiff in this respect prayed that this balance might be declared not to be a debt, and as he occupied the threefold character of surviving partner executor, and trustee, that his accounts might be settled under the direction of the court; and further, that it might be declared whether in the legacy to the plaintiff, in trust for the heirs of William H. Bullock, the testator's share of the profits passed.
The plaintiff then set forth his belief that the testator constituted him a trustee for the children of his son William and his daughter Fanny Ann Hunt, solely because of the insolvency of their respective fathers, and that he had the utmost confidence in the integrity of his son and son-in-law and would have constituted them trustees for their respective *Page 252 
children had he not feared that thereby the property given the latter would have been subjected to the debts of their fathers.
The plaintiff then avowed his belief in the integrity of his brother and brother-in-law, and prayed that they be constituted in his (312) stead. If the plaintiff could not succeed in this, then he prayed that it might be declared whether he was a trustee for the children of William H. Bullock and Fanny Ann Hunt born at the date of the will, or at the death of the testator, or whether the trusts extended to children subsequently born. The plaintiff further requested direction as to the course he was to pursue in making the final division; whether he was to estimate, in making up the share of each of the legatees, the balances against them on the books of his testator, and also the pecuniary and specific legacies given them by the will; and as he was interested in that division, that it might be made under an order of the court. Upon this subject the plaintiff admitted that he was to account in the division of the residue for the $4,000 given him by the fourth clause of the will, and he insisted that the testator, in speaking in the tenth clause of the drawback due by the plaintiff and the heirs of Fanny Ann Hunt, alluded to the $4,000 given the former and to the payment mentioned in the eighth clause made by him for the land devised to the heirs of the latter. And, finally, the bill stated that the plaintiff was entirely ignorant of the property which was subjected to the cross-remainders created by the last clause of the will — whether the cross-remainders attached upon all the property which passed under the will, or were confined to that disposed of by the residuary clause; whether they applied to all legacies as well pecuniary as specific, or whether they were confined to the last, and if applicable to the pecuniary legacies, the plaintiff prayed he might be protected in paying them over. All the parties interested under the will were made defendants. Of these, William B. Inge was a nonresident and did not appear and answer.
By an amendment the plaintiff stated that one of the children of Fanny Ann Hunt had died, and that he had been advised to administer upon its estate, but he averred that he was entirely ignorant whether (313) the interest of that child under the will of his testator survived to its brothers and sisters, or whether he (the plaintiff) held it in trust for the next of kin; and in this respect he prayed instructions.
By consent, the master in the court below was directed to inquire whether William H. Bullock and John Hunt were proper persons to substitute as trustees for their respective children, and whether the property of their children would be safe in their hands. It was also referred to him to state an account of the Clarksville copartnership, and of the amount which the testator had paid and the plaintiff was still liable to *Page 253 
pay for the land devised to the heirs of Fanny Ann Hunt, and also to state an account of the property advanced by the testator to his children, contained in the books. The master reported that W. H. Bullock and John Hunt were proper persons to appoint trustees for their children, and that the property which their children took under the will would be safe in their hands. He also stated the accounts ordered to be taken, and there were no exceptions filed to his report.
This bill is filed by John Bullock, executor of William Bullock, to have the trusts of his testator's will declared, and to have the advice of the Court on the execution of them. It is a proper case for such an application, as the will in many parts is of very doubtful meaning.
The question which presents itself is as to the increase of the slaves bequeathed to his daughters Susan Jiggits and Lucy Lewis, and to his grandson, William B. Inge. As to the latter, we decline to give an opinion, as the testator says he has made his grandson a deed of gift for the slaves. This deed must determine the question, and we have it not before us.
As to the two former, we think that the increase passed to his (314) daughters respectively, together with the original stock, as we look upon the bequests rather as confirmations of prior gifts than as legacies de novo. The testator, in describing the original stock, says they are the slaves which he put into their possession, upon their marriages respectively. Our act of 1806 (Rev., ch. 701) does not annul entirely gifts of slaves made by parents to children, either express or those presumed from a delivery of possession, but leaves them in the hands of the child as an advancement, if the parent does not by will or otherwise declare the contrary. And although in this case they are not advancements, so as to be brought into hotchpot, for there is no intestacy, yet they have that character so far as to form a guide in arriving at the testator's intent. There are additional reasons appearing upon other parts of the will which support this conclusion. In the clause creating cross-remainders we understand that this property is not esteemed as property received under the will, but as falling within the description of that heretofore received. The codicil affords strong proof that as to these legacies he did not deem it necessary to mention the increase in order to pass them; for he therein declared that as to the increase of the negroes bequeathed to his son John, in trust for the heirs of his son *Page 254 
William and of his daughter Fanny Ann, he intended it should pass, and is silent as to the increase of those bequeathed to his daughters Susan and Lucy. In the will they were bequeathed in the same way without the increase. As to those given in trust for the heirs of his son and daughter, there had been no prior gift or delivery to the trustee, or the heirs, which the will could confirm; and, therefore, the testator very probably concluded that it required express words to carry the increase. He there inserted the increase in the codicil as to them and said nothing as to the legacies in question, thinking, as we believe, that the increase passed by the confirmation of the original gift. An additional reason might be given. He made a deed of gift to his grandson, William B. Inge, (315) for the negroes he put in the possession of his mother under the same circumstances. This deed carried the interest from its date. Why, then, it may be asked, should he make this exception against these two daughters?
We think, also, that the bequest to the plaintiff of the testator's interest in the Clarksville store, in trust for the heirs of his son William, carries with it the testator's share of the profits. This, we think, sufficiently appears on the face of the will. But taken in connection with the master's report made from the books of the concern, and from the testator's own books, to which we think the testator has given a testamentary character and which ought to be proved as parts of his will as far as they are referred to in it, there cannot be a doubt on the subject. The words of the will are: "My said son John (who became the partner of the testator after the purchase) is to continue to manage it to the best advantage, as he has done for several years past, with all the purchases he has made of (with) said stock, for the benefit of John and William Bullock, I do hereby leave for the benefit of the heirs of William H. Bullock." From the master's report, it appears that nearly the whole of the stock and profits, at least a great part thereof, had been applied to the use of William H. Bullock, with the testator's consent. I say with his consent, for he was a partner, and lived in the neighborhood, and it is presumed he knew the state of the books. And further, the sum of $1,015.10, the one-half of the amount given for the goods by William and Richard Bullock, to William and John Bullock, is carried to the testator's own books, and entered as a credit thereon to William H. Bullock. We cannot but understand from this that the appropriations made to the use of William H. Bullock by John Bullock, the active partner, were known to and approved of by the testator. And these advances made to William H. Bullock, and appearing on the testator's books as charges against him, against whom and all his other children it appears that the testator kept accounts, is conclusive evidence to show both that *Page 255 
the testator intended the profits to pass, and also approved of (316) the appropriation of both stock and profits by the plaintiff, the active partner, to the use of William H. Bullock. No exceptions being taken to the master's report on this subject, the same is confirmed; and the executor is directed in closing the accounts of said concern to make the said report the basis of the settlement.
The next question is as to the meaning of the words, heirs of the body, or heirs proceeding from the body; for the testator uses both expressions indiscriminately. The words import a present gift. And if there is no person to take the legacy, it is void. As to the meaning of the words heirs of the body of William H. Bullock, we are relieved from all difficulty on the subject; for the testator notices in another part of his will that his son William H. is alive. In speaking of some article, he says, "which my son William H. has now on loan." Evidently, therefore, he did not mean heirs in its technical sense, the representatives of a dead man, but heirs apparent, to wit, issue, children. And we think the same construction must be put on the words "heirs of the body of Fanny Ann Hunt." In the first place, we have a specimen of the testator's meaning of the words, and, unless controlled by other words, the same words should have the same meaning, and especially when used by the same person in the same instrument, on the same subject-matter. The words are "proceeding from the body"; which word proceeding is future, contingent, not past — which have proceeded. It looks forward to the having of other children. Another reason might be given, if necessary. The testator mentions his daughter Fanny Ann many times. He never declares whether she is living or dead. He mentions his daughter Elizabeth but once. He then calls her his "deceased daughter." I have avoided touching on the doctrine of Stith v. Barnes, 4 N.C. 96. We are, therefore, of opinion that in each case the words heirs of the body mean children, or rather issue. The next question is, Do these words take in after-born children, or is it confined to those born at the making of the will, or the testator's death? We think it embraces all. And we rely on the word proceeding as sufficient, independently (317) of all other reasons. We are aware that in the conveyance of a mere legal estate, the estate cannot open and shut, as it is called; for the estate must pay to the grantee at first or not at all. I speak of immediate freehold interests. It is otherwise as to a use or a trust. These may cease in one person in whole or in part and arise in another. And if it be a use a sufficient scintilla of seisin remains in the trustee to be converted into a seisin to feed the new use. And it is the same in wills. But here there is not only a will, but a trustee also for the heirs, as well those born as those to be born. This is said as to the lands. As to the *Page 256 
personal estate, the inconvenience of permitting it is here avoided; for the legatees in trust are not entitled to the control of the property, or to call for an immediate conveyance on account of these ulterior trusts; so that there is no danger of its being wasted or eloigned, to defeat the ulterior cestuis que trust. And we can, therefore, see no reason why the personal estate, also, should not open upon the birth of a child and let it in to the benefit of the trust. And if there was no trustee appointed by the will, the court, to effectuate these intents, would declare the heir and executor trustee for that purpose.
The next question is, what property is subject to the cross-remainders? From the will we are bound to say, all the property taken under it. These are the testator's words; and there is nothing in the will to control them or vary the meaning, only the expression "not adverting to what has heretofore been given." This can control them so far only as to exclude all property which the will states, either expressly or impliedly, to have been heretofore received; for, as to that, the testator has made the will more confirmatory than legatory. But we cannot travel out of the will to ascertain what he intends to confirm as a gift or quasi gift, and what he intends as a legacy de novo entirely under the will.
[His Honor then proceeded to specify what property was subject to the cross-remainders, and came to the conclusion that all the (318) property which had not been given by the testator to his children before the date of the will was thus subject — including in this exception property which had been given to William H. Bullock and Fanny Ann Hunt, but which was by the will devised to the plaintiff in trust for their several children.]
The executor has asked the advice and assistance of the Court in regard to the property subject to the cross-remainders. He must take bonds from the legatees with ample sureties, payable to himself, that the property shall be forthcoming in case it shall be necessary to perform the ulterior trusts of the testator's will.
Upon the subject of accountability for the receipts and advancements to equalize the distribution, upon what the testator calls the first division of his estate, we are left somewhat in the dark. But after much consideration, we think that nothing received under the will, except the $4,000 to John Bullock and a part of the legacy given to him in trust for the heirs of Fanny Ann Hunt, are to be accounted for. The testator's will, as to what is equality, is the sole law. He can by his declaration, so far as respects this question, make that equal which is in fact unequal. In giving the other legacies, he says nothing about inequality, but whenever he speaks of these two, he speaks of equality and drawbacks, and directs that they shall be accounted for upon the division. *Page 257 
It appears, also, that the testator had something else in view when he speaks of equalizing the other legatees. The master reports that he had kept accounts against his children. It must be that he refers to those accounts when he says these two legatees are in advance of the others. Had not the testator by referring to his books made them in some degree testamentary, we could not possibly travel out of the will to ascertain his meaning. In making the division, the executor will not consider the legacies given in the will, except as above mentioned, as creating the inequality to be made up upon the division. But he will be governed by the master's report on the subject as to the advancements made to the different children, and will make that the basis on which to found the equality directed by the testator, except as to the legacy to himself of $4,000, which he will take into the account as so much (319) advanced him, together with interest thereon from the time he received it. He will also take into account the moneys paid by the testator for the land devised to him in trust for the heirs of Fanny Ann Hunt, together with all his testator's liabilities for John Hunt, deducting therefrom the bond which his testator gave to John Hunt, all which appears upon the master's report. The executor will strike a fair balance, and make what is due from John Hunt the basis of equalizing the legacy to the heirs of Fanny Ann Hunt upon the division. In striking the balance, the executor will include what he, as executor, has yet to pay on account of his testator's suretyship for John Hunt, as well as what he has paid.
The clerk and master having reported that William H. Bullock and John Hunt are prudent and discreet persons, and properly qualified to take the management of the property bequeathed to their respective families, the executor is hereby authorized, if he thinks proper, to put the trust property into their hands respectively for the support of their families and to permit them to expend the whole profits for that purpose and in the education of their children, the master having reported that they are not more than sufficient for that purpose. But the property is to be under the supervision of the executor, who may at his pleasure withdraw it, and must do so upon their mismanagement.
As to the application of the trustee to be permitted to retire from the trusts, we can see no reason why he should, and therefore refuse his application.
We are also of opinion that the heirs of William H. Bullock and the heirs of Fanny Ann Hunt form a unit each, and that upon the death of any one of them the share of the one so dying goes to its heirs and next of kin, and not to the children of the testator.
PER CURIAM. Decree accordingly. *Page 258 
At this term the plaintiff filed a petition, verified by affidavit in which he stated that the defendant Richard Bullock had become (320) insolvent, and, as far as the interest of his infant cestuis que trustent extended, he prayed that the legacy of the defendant Richard should not be paid over to him.
The defendants also filed a petition to rehear that part of the former decree which declared that all property which passed under the will was subject to the cross-limitations, contending that it only applied to the property to be received at the last division. A rehearing was also had of the former order, refusing to substitute William H. Bullock and John Hunt as trustees for their children instead of the plaintiff.